The L.A. Bar Association is now back in session. The Honorable Justice Jesse G. Reyes is confined. We came in the wrong order, but we'll get to that. Please have a seat, Ellen. Cascades Holdings With counsels who are going to honor you as mayor, please step forward. Approach the podium. Identify yourselves for the record, and then also state what party you're representing. Good morning, Your Honor. My name is Steve Leach, and I represent Tapco Associates LLC. Good morning. I'm Robert Roth, and I represent Cascades Holdings US Inc. And just as a reminder, Roth, I-R-O-T-H. Oh, Roth. All right. Thank you. And just as a reminder, the microphone doesn't amplify, so if you could keep your voices up loudly and clearly so it could be recorded properly. And then 15 minutes apiece. Any time for rebuttal? We would reserve five minutes for rebuttal, Your Honor. Five minutes for rebuttal. Okay. All right. Ready to proceed? Thank you, Your Honor. May it please the Court, my name is Steve Leach, and I represent Tapco Associates LLC in this cross-appeal. The appeal presents three issues. I will start with the issue of contractual interpretation as we view that as the principal issue here. We believe this is a very straightforward case involving contract law and the law regarding contract modification. Basic definition, the modification adds new elements into the details of the contract, but leaves the general purpose and effect of the contract undisturbed. As the Court probably is aware from the briefing, this case involves two specific contracts, a 2004 PSA that had as its term and duration provision, one provision, that provided that that contract could be terminated by any party upon 90 days' notice. Would you agree that the 2018 agreement doesn't specifically reference the 2004 agreement? It does not specifically reference the 2004 agreement. However, I think it's very clear from the text of that document that it is a modification of that document. It does not purport to supersede that 2004 document. But it does, however, add some different terms. And under the case laws we have cited, if a term in a modification is inconsistent with a term in the prior contract, the term in that prior contract is rescinded. And we submit respectfully that the term and duration provision in the 2004 PSA is completely inconsistent with the term and duration provision in the 2018 partnership proposal that the parties entered into. That contract was a fixed-term contract. It ran until a specific date, and that was the intent of the parties to extend their relationship to that specific date. To allow for a 90-day termination for convenience for any reason would be completely inconsistent with the parties' expectation as expressed in that 2018 partnership proposal. So there's a number of provisions, not just related to the term, that I think reinforce that that was the parties' intent. As we all know, the parties' intent is to be construed from the documents themselves. And here there are a number of commitments that are time-specific, going into 2019, a two-year cost component review, and a general end date of September 30, 2021. Another point that I think demonstrates that the partnership proposal intended to rescind the termination for convenience clause is the fact that there are grounds for termination set forth in the 2018 partnership proposal. And these grounds are basically four-clause grounds. Should service levels fall below a set level for a specific period of time, at that point, TOPCO had the ability to exit the relationship. This is inconsistent with the idea that the parties can exit the relationship at 90 days. But isn't it possible to have a contract where you have an expiration date, but then you're able to terminate? Certainly. You could certainly have a contract with both provisions. I think there's a number of cases that are gone into in the brief that do have expressed end dates with termination dates. And arguably, I would say the partnership proposal is consistent with that because it has provisions for termination. But these are four-clause provisions. So as a general matter, absolutely, Your Honor. You can certainly have an expiration and a termination provision in the same contract. I just think with the facts before us here with these two specific documents, we do not have that case in front of us. And again, the language that was emphasized, the length of the relationship was a critical component for Capscades. This just reinforces, again, what I think is plain from the other provisions in the partnership proposal, that it was to be a fixed-term contract and the ability to rescind it by either party on 90 days' notice. That's just inconsistent with that language. I think we can talk about the cases. I think the Schweider case discussed at length in our brief is the most analogous case. There, the original contract provided that the buyer has its sole remedy for the seller's default, the return of its earnest money. They modified that contract. And the modified contract gave the buyer the sole option to terminate the contract. Option implies that they had other paths available to them. So in interpreting the contract, the appellate court found that the limitation of liability in the original contract had been rescinded, even though it was not expressly addressed in that particular agreement. And therefore, instead of being limited to the return of their earnest money, the purchaser was allowed to seek a specific performance. I don't believe that the cases relied upon by Cascades are applicable here. A lot of these, as I think I've touched on, did involve two express different contracts, different contractual terms, one for expiration or duration and then one specifically allowing termination. Again, this contract, I think, is fundamentally different because both contracts really have just one term. They're dealt with duration entirely. I can go through them, but I don't think we need to really address them. I have a question on the Conoclaim. Certainly. Okay. So if we were to find for Topco on the issue of Cascades' ability to terminate, what effect does that have on the Conoclaim? It would require the vacation of the judgment below. To the extent they have merits in their Conoclaim, I believe that would probably be addressed as an offset to Topco's damages for brief. So would that require a new trial then? It would require a new trial on – well, it would require in the first instance a trial on Topco's damages, which was never tried, and we did not move for summary judgment on that because I do believe that was appropriately an issue of fact. We never reached it because of the summary judgment ruling. So a new trial would be essential on that point. And then to the extent Cascades believes it has meritorious claims, though we'll address that with the witness as you've seen in the briefs. I'm sorry. In their attorneys' briefs, they'd be reversed. Well, yes. Correct, Your Honor. Thank you. In regards to witnesses, how was Topco prejudiced by Frazier's testimony? He was their sole witness, and he testified on matters – I mean, I think we've demonstrated in the case as a whole, but it's not sufficient – the Asheville case in particular is good on this point. It's not sufficient to identify someone as being a person with knowledge about relevant topics. When a 213 interrogatory is propounded, and that was certainly propounded here, it is required that the witness be identified as a witness. And in this case, not only was the witness not identified as a witness until the pretrial disclosures, he testified on matters that were not identified in the interrogatories about the counterclaims. Wasn't his testimony mostly based on authenticating the invoices and the receipts? Yes, but again, that's – again, that was not disclosed to us. That's the disclosure violation, and we do believe that is prejudicial, because we never deposed him on these issues because he was never identified as being a potential witness on these issues. Okay, so Topco didn't have these receipts and invoices that he testified during the trial. We had the – the document that was admitted at trial was, I believe, an attachment to their pleading. We certainly had that record, but we did not explore in discovery with him anything underlying that record because it was not – he was not disclosed as a witness. The topics that he was disclosed as a witness on were largely uncontroverted. I mean, no one disputed that the parties entered into the 04 contract and the 18 proposal of the modification. We only needed to take a deposition on these points, and we did not. So we believe that we were absolutely surprised. Again, I think it's very similar to Ashpole, where the witness was the one witness in Ashpole, the undisclosed witness. He was the only one who was a direct eyewitness of the incident that was – that wasn't a crux of the Ashpole case that was, I believe, a slip and fall in a bowling alley. And that was – and he was the only witness, eyewitness, to testify in favor of the defense's theory, and that was found to be prejudicial. So I think it's very analogous here. They have one witness testify in the substance of their case, and he was undisclosed. So I think that is prejudicial surprise, and that the remedy was very clear that he should have been barred. I do not believe that his testimony can be considered simply foundational. It certainly was not cumulative, as he was the only witness. The other factor is on the six-point test. I think we go through them, again, in detail in the brief, but I believe Topco is timely in serving its interrogatories and properly asked for the interrogatory. We timely objected to the disclosure of trial. There's really no argument here that this was a 213 violation. I don't believe anybody contends that the rule was complied with. I think the law is very clear on that. There was no compliance with this rule. And I think when you look at the surprise and the prejudice to Topco, the barring him was the only appropriate remedy. So that would warrant, in that instance, then they would have had no witnesses and certainly would have warranted a finding for Topco on the counterclaim. With respect to the issue of attorney's fees, I think that's, obviously, it's fact-specific, and the amounts are certainly discretionary, but we do think there was an abuse of discretion here. In particular, the rates we objected to as being too high, and I think the time slot was excessive as well. The counsel at trial acknowledged that this was a straightforward breach of contract case, and yet the rates are $900 per hour going up to $1040 per hour. Again, on a straightforward case, I think that's excessive. And that was less than Topco's, correct? Considerably less than Topco's. Is that something that we should take into consideration? I think that's something that can fairly be taken into consideration. Obviously, attorney's fee decisions are done on a case-specific basis. It's very fact-intensive. And I certainly mean no disrespect to any opposing counsel in terms of their qualification or skill. Absolutely, they are qualified and skilled. But I simply think the amount is excessive here. For my sake, we do mention our rates, not because I think our rates are completely dispositive, but I think it would be fundamentally unreasonable for me to stand before Your Honor and suggest that $900 is an inappropriate rate if I'm charging $1,000. So we put ours in the record there, and I think it's a good illustration. I know we don't cite it in the brief, but I've had cases where our rates have gone before the appellate court and they've been affirmed as reasonable. So I think it's a reasonable standard to suggest. I think it's something the court can consider. Certainly, you know, there's no rule that says that's dispositive. And we can consider the fact that this case is so simple, I can't even believe it. Because this case is so simple. I agree, Your Honor. It's a very straightforward case. I think the time spent, we go through the numbers, I think it's, again, substantially higher. There was no real difference in the amount of work counsel points out that they had to review. I wouldn't characterize it as a document dump. I had a computer expert pull the records. I had to review a lot more records than they did to get it to the responsive documents. But we had to do that as well, Your Honor. We had to review them. We had to do trial prep. We had to present the witness for depth. I just think the tasks involved did not warrant that level of time. The fee request was 73% of the amount of what the Cascades recovered. They recovered about 400-something, and the fee request was in the 300 range. Again, I think it's just excessive to the amount at stake. So we do believe that the trial court should have either further reduced the amounts requested or just partly request entirely. Turning briefly to the cross-appeal, I think the same factors that I've just touched on show that they're not entitled to more fees. Again, I think if you look at the contract here, it simply limits their ability to collect attorney's fees for their legal work that was done in collecting sums due from TACO. And this is basically proving up unpaid invoices. Again, a very straightforward issue. I think it could be segregated from the issue of whether or not they had the right to terminate the contract when they did. I think it should have been segregated, and I think it would be inappropriate to award them any further fees. There's a great deal of discussion in the brief about whether or not they're intertwined. The two matters, and certainly there's some overlap, but I think, as I said, that they can be separated. If we look at the case law that's relied upon, most of these cases involve either contracts or statutes that have a more standard, in my experience, prevailing party provision. And there's no question in my mind that they would not have to segregate. If they were simply a prevailing party, if that's what the contract provided, then they would have been entitled to all of their fees. That was not what the contract provided. It provided simply that they were entitled to their fees in support of their collection efforts, and I think that was a much more narrower issue than the other issues that were raised, so I do not believe additional fees would be appropriate. In conclusion, then, for the foregoing reasons set forth in our briefs, we respectfully request that the appellate court reverse the trial court's ruling on the summary judgment issue, award Topco's summary judgment on that issue, rename the case for a trial with Topco's damages, and reverse the judgment in favor of Cascades on their counterclaim and vacate any terms for the award. That's all I have on this. Thank you. Thank you, Robert. May it please the Court. Your Honor, it's been pointed out that this was a straightforward case. In many ways, it was a simple case in the sense that Topco ordered products from Cascades. Cascades delivered them. Cascades resold them at a profit and never paid for them. That's very straightforward. That's very simple. But the litigation that's lasted years actually became complicated because every step of the way, Topco fought tooth and nail. They moved to strike affirmative defenses. They filed for summary judgment and then opposed summary judgment. They had witnesses that we did have to depose. They didn't take any depositions, but we did have to. And to your last point about is it fair to look at their fees, only if the work is the same and only if the risk is the same. Their claim against Cascades was about ten times the value of the claim, the counterclaim by Cascades back. And the fees that were covered were nearly ten percent of the amount in controversy on that. Another thing that Your Honor raised that I would like to address is what would happen if the court did reverse this and sent back. So in summary judgment, the cross motions for summary judgment, there was another issue. And that issue was whether there even is an enforceable contract. Because it's undisputed in the record, even in the trial testimony, that there's no quantity provision in the contract. There is no minimum requirements provision in there. And under Illinois law, that cannot be enforced as a contract. And so that court, the court came through a rule on that issue because it granted us summary judgment on the other issue about the termination, expiration, you know, distinction. But that would have to be done first. So liability would still have to be determined. You can't just remand this for a ruling on damages in the unlikely event that the court were to reverse this. And I say unlikely event because when we're talking about termination versus expiration provisions on this, they're common. You know, the cases we cited show over and over again that there's a difference between an expiration of the contract in which a contract no longer exists by its own terms, such as the passage of a date or the death of someone or whatever that may be, that there's no action required by any party. Whereas a termination provision requires an affirmative act. Somebody has to do something, has to provide 90 days written notice or 30 days written notice or has to find a material defect in the product. And I think it's important to note that we're talking about the intention of parties. The party's intention is spelled out very clearly in saying this agreement cannot be modified unless it's done so expressly, in writing, and signed by the parties. We don't have any agreement that expressly modifies a termination provision in this case. And, in fact, there are multiple terminations in the 2004 PSA, which is the product supply agreement in there. Is the 2004 referenced in the 2018 agreement? So the 2018 agreement is the modification to the 2004. And every term in that 2004 agreement that was not expressly modified remains. It survives. Okay. What about the inconsistent state law? I'm going to call it inconsistent. The first contract gives you a right to terminate. The second contract says the length of the partnership through September 30, 2021, is a critical component for Cascades. The length of this partnership allows Cascades to strategically invest in new high-speed equipment to support our mutually aggressive growth plans. Doesn't that say that this contract has to go until September 30, 2021, and you cannot stop it? That's the part that's missing. It doesn't say you can't terminate. In fact, it holds on to those various provisions in the 2004 agreement that expressly say you can terminate it. So the 90-day written notice survived. The provision in paragraph 5.7, I believe it is, that allowed Topco to terminate early in the event that it chose to based upon a defect in a product. You don't think that the statement I just made in the 2018 is inconsistent with what was said in 2020-04? No. One address is an expiration provision that was missing in the 2004 agreement. So that's a change. There's now an expiration provision added. But as far as the parties' rights to terminate, those were never even mentioned. In fact, they're left in the agreement in multiple places in that agreement. Then why do they call it a critical component of this contract that it goes through September 30, 2021? The record is silent on that other than what's stated in the 2004 agreement itself. It would be an opportunity for Cascades to recover investment costs if it chose to make those investments and if it chose to proceed with the agreement. So there are two different things. It's apples and oranges. And the cases make that clear. In fact, even the parties' course of dealing makes it clear. They have other agreements that also mention expiration or termination as separate things. And the 2004 PSA specifically references the contract ends by termination or expiration. Two different things. And unless you're going to specifically and expressly modify that, then it survives. And that's what happened here. And the lower court conducted its analysis, and that's the conclusion that it came to. And that conclusion is consistent with the law in Illinois as well as elsewhere on that. The Higgins case, for example, cited in both parties' briefs, I believe definitely in ours, specifically talks about the fact that there's nothing inconsistent about expiration provisions and a termination provision which allows something to be finished or end prior to the expiration. So you have to address both, and you have to do expressly by the terms of the 2004 agreement. And what they're trying to do is do this implicitly. They're trying to ask this court to read out that termination right when the parties never put that in writing that they wanted it read out. They agreed to have it read out. And so that's what I would believe that the lower court got it right on the termination versus expiration provision on that. Regarding the counterclaim, same question that I asked Counselor Topko. So if we fund for Topko on the issue of Cascade's ability to terminate, what effect does that have on the counterclaim?  The counterclaim still survives because the counterclaim, we still have accounts faded. We still provided them goods they never paid for. So we're going to need a new trial. We would need a new trial on both liability because of the thing that I mentioned earlier about there not being a minimum quantity provision in the agreement, and so it wouldn't be enforceable against it. So it would be a liability trial unless summary judgment were granted on that issue. And then there would be damages. Did you disclose Frazier as a 213 witness? So the 213 responses are in the record. And he's not disclosed as a witness to be called. Instead, he was disclosed as one of the few people with knowledge of the particular facts on this. And he was known to plaintiffs from before they even filed their complaint. Mr. Frazier is the person who authored the termination letter on this. What about the issue about the discovery that they didn't have the documents that he testified with during the trial? Now, I think you may have misunderstood. He said that they do have the documents that were testified. It was attached as Exhibit 1 to our counterclaim. So from the very initial pleading, they had the document that went in. In the record, you'll see the references to a portal. And I wrote a background. The parties did business electronically. Purchase orders would be submitted electronically. They would be approved or accepted electronically. So both parties had equal access to that portal. And it contained all of the information that would be the subject of their claim and our counterclaim. Both sides had that information and could confirm it any time they want, long before the lawsuit was even commenced. They could look at that, and they did. They monitored it. They made changes. And they made adjustments to it. So initially, before someone's judgment was granted, Topco was going to use that portal to establish its damages. But it was no longer provided. It had a witness. It withdrew that witness, and that's why we had to amend to say, okay, you're not going to call the guy to authenticate the portal. We've got to call Mr. Frazier to do it. And that's all that there was to it. And for counsel to suggest that they were surprised and they didn't take a deposition, they didn't take a single deposition in this case. And if you take a look at our interrogatory responses, we specifically had Grant Stevenson, another witness, that we had disclosed as a potential trial witness. We didn't end up needing to call him, but we disclosed him. And he was going to testify to these damages. And then they took Mr. Stevenson's deposition. So the record actually belies the contention that they would have taken a deposition on this fundamental issue of a shared portal that both parties lived with day by day on that. As he said, there's no reason to. They were familiar with it. And they chose not to do it with regard to Mr. Grant Stevenson. So I don't see why just changing from Stevenson to Frazier has any impact at all. It's the exact same testimony about the exact same portal and exact same numbers. But it was the foundation of both parties' claims on this. So is there anything else on the merits? I have no questions. Okay. And then just down to the attorney's fees. I just want to point out again with the attorney's fees that they aren't equal. We had major, major claims against us. There were more than ten times. And we're still fighting this case. You know, they're continuing to stall. It's as simple as we talk about case. They got the goods. They resold them at a profit. And we even got a dime out of it. That's about as straightforward as you get in a case like this. But throwing all of these legal technicalities and arguments up roadblocks every step along the way and producing over 10,000 documents to us, you know, this case to go through, made this case busy, if you will. Straightforward at its core, but required a lot of work in order to get where we ultimately got, including where we are today. Thank you. One last thing. It's in the briefs, but the intertwined issue as to whether or not we could recover the additional fees, I think that a briefing speaks for itself on that. But I didn't want to give the impression that we were abandoning that. We believe that the court got that wrong as a matter of law. Because the law is, if you look at it and say, well, the contract covers this provision but not these fees, you have to then look and see whether they're intertwined or not. And there's no question here that they were intertwined. Actually, the court's order specifically says they're indistinguishable. Thank you for your attention. Ramal? Certainly, Your Honor. I'll be very brief. Just with respect to the contract, the 2004 PSA does have what's called an integration clause, and it states no amendments or modifications of this agreement, this agreement being the 04 PSA, shall be valid unless in writing and signed by both parties. There's no requirement that anything, any particular provision be expressly referenced in a modification. It simply has to be in a writing signed by both parties, which is what we have here, absolutely. With respect to the fee argument, a couple points were made that I'd respectfully disagree with. The case, in my opinion, was litigated in a very normal fashion. I mean, yes, there was a motion to strike some affirmative defenses. We felt some of them were legally improper. Again, that's routine. We did interrogatories and document discovery. There was a single deposition. I don't believe this case posed any particular complexity in any way in terms of how it was litigated. With respect to the stakes, the stakes were equally the same as Topco's. Topco had the same stakes in this case as Cascade's, so I don't think that is anything that would change the game. The critical component language, I think, is really what does expressly eliminate the termination for convenience language. I just think that's fundamentally inconsistent. That language in the 18 PSA is fundamentally inconsistent with the termination for convenience clause. With respect to the witnesses, certainly we would have deposed Frazier had we known he was going to be the person presenting their counterclaims. I'm not sure I follow counsel's argument about our witness. Certainly our witness list changed when the trial court essentially gutted our complaint with the summary judgment ruling, so we acknowledged at trial that we could not prevail on that count. What about the argument regarding the portal? Regarding the portal, we were planning to use Scott Bennett to prove up our damages. There were documents that were in the production that we were going to rely on. I don't know. I mean, I presume. I can't say with certainty off the top of my head, but I believe that did probably come from the portal, but the documents that we were going to rely on were what Mr. Bennett was deposed upon. He was our damages witness. I think both sides would have agreed that this was the contract interpretation matter is the contract interpretation matter. I would agree with counsel that there was an affirmative defense about the requirements contract. We believe it's not a meritorious affirmative defense for all the reasons in the record. It's not really before the court on this appeal because it was denied at trial, but that would be a live issue. So to clarify my answer previously, I think that it is fair to say that on remand that would still be a live issue as well. And beyond that, I don't have anything further to add. Any questions? No, thank you. Any questions? Okay. Thank you very much. I want to thank counsels for a very interesting case, a well-argued matter, and the court is adjourned. Thank you. And we're going to take questions.